# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JENNIFER AUGUST,<br><br>        Plaintiff,<br><br>    v.<br><br>THE GLADE PROPERTY OWNERS ASSOCIATION, INC., THE BOARD OF DIRECTORS AND OFFICERS OF THE GLADE PROPERTY OWNERS ASSOCIATION, INC., 2018-2019, 2019-2020 AND 2020-2021, and SEASCAPE PROPERTY MANAGEMENT, INC.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)  C.A. No. 2020-0834-BWD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MASTER'S FINAL REPORT

Final Report:  May 1, 2023
Date Submitted:  February 28, 2023

Jennifer August, Rehoboth Beach, Delaware; *Plaintiff*.

Aaron Moore, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, P.C., Wilmington, Delaware; *Attorneys for Defendants*.

**DAVID, M.**

This final report resolves Plaintiff's and Defendants' competing motions for summary judgment (together, the "Motions") on Count I of Plaintiff's Verified Complaint (the "Complaint").

The *pro se* Plaintiff in this action, Jennifer August, is a homeowner in the Holland Glade community located in Rehoboth Beach, Delaware (the "Community"), a common interest community as defined in the Delaware Uniform Common Interest Ownership Act ("DUCIOA"). The Community is maintained by The Glade Property Owners Association, Inc. (the "Association"), a Delaware nonprofit, nonstock corporation. In September 2020, Plaintiff initiated this action, lodging dozens of grievances against the Association and its property manager, SeaScape Property Management, Inc. ("SeaScape"). Chief among those complaints, Count I of the Complaint challenges a 2019 amendment to the Community's Declaration of Covenants and Restrictions (the "Declaration") imposing occupancy and rental restrictions on homes in the Community (the "Amendment").

The procedural and substantive objections Plaintiff has raised to challenge what she believes was a "puppeteered election" using "sham voting procedures," resulting in an "unconscionable," "discriminatory, arbitrary, [and] unenforceable"

Amendment, are numerous.[1] This final report attempts to make sense of each argument with the leniency typically afforded *pro se* litigants, while still holding all parties to the same summary judgment standard that prohibits either side from relying on "mere allegations or denials" once the other has demonstrated the absence of a material fact.

For the reasons explained below, I conclude, contrary to Defendants' arguments, that Plaintiff has standing under 8 *Del. C.* § 225(b) to bring her claim challenging the Amendment. I further conclude, however, that neither the law nor the record supports Plaintiff's procedural and substantive attacks on the Amendment. Accordingly, I recommend that Plaintiff's motion for summary judgment be denied, and Defendants' motion for summary judgement be granted, as to Count I.

## I. BACKGROUND

The following facts are drawn from documents submitted in support of the Motions.[2] Although the parties submitted evidence covering dozens of issues over

---

[1] Verified Compl. to Set Aside the Am. Covenant Restrictions 12.2.1; to Recover and Distribute Assets; for Repairs and Maintenance Under the Deed; and for Other Equitable Relief ¶¶ 4, 8, 126, 131, Dkt. No. 1 [hereinafter, "Compl."].

[2] In support of their motion, Defendants submitted copies of the Governing Documents and two other documents relevant to Counts II and III. All other documents were submitted by Plaintiff.

time periods far broader than those addressed in the Complaint, I summarize only the record evidence relevant to Count I of the Complaint.

### A. The Community, the Association, and the Governing Documents

The Community is a residential community in Rehoboth Beach, Delaware. The Community is a "common interest community" as defined in the DUCIOA. 25 *Del. C.* § 81-116. Because it was established in 1991, nearly two decades before the DUCIOA was enacted, the Community is considered a "preexisting" community under the act. 25 *Del. C.* § 81-119.

The Association is a Delaware nonprofit, nonstock corporation tasked with "managing, maintaining, and caring for the common facilities, common lands, and recreational amenities of" the Community. Pl.'s Omnibus Mot. For Declaratory J. and Summ. J. on Counts I, II and III Under Chancery Ct. R. 56(a), 56(c) and 57, Ex. 1, Dkt. No. 137 [hereinafter, "Certificate"]. As a Delaware corporation and a common interest community, the Association is governed by both "external authorities"[3]—the Delaware General Corporation Law ("DGCL") and the DUCIOA—and "internal authorities"—the Declaration, a certificate of incorporation ("Certificate"), and corporate bylaws ("Bylaws," and with the Declaration and Certificate, the "Governing Documents").

---

[3] *Beck v. Greim*, 2020 WL 6742708, at *2 (Del. Ch. Nov. 17, 2020).

4

The Declaration provides that "[e]ach owner of any property now or hereafter subjected to this Declaration shall automatically become a Member [o]f the Association." Compl., Ex. 2 at Section 3.2.1, Dkt. No. 1 [hereinafter, "Declaration"]. The Declaration also provides that:

> The Association shall have one (1) class of voting membership consisting of the Members of the Association. All Members shall be entitled to vote on all matters coming before the membership. Votes shall be cast or exercised by each Member in such manner as may be provided in the By-Laws of the Association. The Members shall have one (1) vote for each Unit which has been conveyed by fee simple title to the Owner and the deed therefore recorded in the public records of the County.

Declaration at Section 3.3. An amendment to the Declaration

> must be approved by the affirmative vote of at least sixty six percent (66%) of the Members of record entitled to vote. There shall be only one vote per Unit in person, by proxy, or by mail ballot when so canvassed. Proposed amendments shall be mailed to the entire Membership and placed on the agenda at least two weeks prior to a special or regular meeting of the Association duly called and held upon notice, or in the case of a mail canvassing, at least two weeks prior to the required return date of the mailed ballots. Covenant amendments may not be submitted from the floor. Only Members entitled to vote may make proposals or vote to amend this Declaration; voting shall be in accordance with Sections 3.3 and 3.5.

*Id.* at Section 14.2.1.

The Certificate empowers the Association to "perform, administer, and enforce the covenants, conditions, restrictions, and other provisions set forth in the [Declaration], the rules and regulations promulgated by the Corporation, and the traffic regulations promulgated by the Corporation." Certificate at art. 3. The

5

Certificate states that conditions for membership in the Association "shall be as stated in the By-laws," and, like the Declaration, establishes "one (1) class of voting membership consisting of the Members of the Corporation," such that "[e]ach Member who is in good standing shall be entitled to vote at every meeting of Members." *Id*. at art. 9-10.

The Bylaws further delineate the voting rights of Members:

The Association shall have one (1) class of voting membership consisting of the Members of the Association entitled to vote. There shall be only one (1) vote cast for each Unit (as defined in the [Declaration]). The person casting a vote with respect to a Unit must be identified on a deed recorded in the Office of the Recorder of Deeds in and for Sussex County as an owner or as a trustee of a trust that is an owner of that Unit within the Holland Glade subdivision.

Each member entitled to vote shall, at every meeting of the membership, be entitled to one vote in person, by proxy signed by the member (no proxy shall be voted on after three (3) years from its date, unless it provides for a longer period), or by absentee ballot on a form as approved by the Board of Directors. Such right to vote shall be subject to the right of the Board of Directors to close the membership books or to fix a record date for voting members as hereinafter provided and if the Directors shall not have exercised such right, no vote shall be voted on at any election for Directors, or for any other purpose, which shall have transferred on the books of the corporation within twenty days next preceding such election. Proxies and absentee ballots should be received at the Clubhouse Management Office not later than one (1) week prior to the meeting. . . .

Absentee ballot voting is permitted for any matter in accordance with the prescribed quorum and voting requirements. The Board of Directors shall provide each member entitled to vote with an absentee ballot with respect to all matters which it knows shall be put to a vote at a meeting.

6

All matters put to a vote shall be carried by a majority of the members voting, unless stated otherwise in a specific section of the [Declaration], or the Bylaws.

Bylaws at Section 3.

### B. The Amendment

Prior to the adoption of the Amendment challenged in Count I, Section 12.2.1 of the Declaration provided that "All Residences shall be used only as single family, private, residential dwellings and for no other purpose. No business or commercial buildings may be erected on any lot and no business may be conducted on any part thereof." Declaration at Section 12.2.1.

The Amendment states, in part:

12.2.1(a). All Residences shall be used only as single family, private, residential dwellings and for no other purpose. No business or commercial buildings may be erected on any lot and no business, except for telecommuting, may be conducted on any part thereof. A Residence shall be further defined to mean a residential dwelling designed or occupied by not more than one of the following as a single housekeeping unit with single culinary facilities:

(1) A Family, defined as a group consisting of one person or a married couple with any number of natural children, foster children, stepchildren, adopted children, parents, grandparents, and/or grandchildren;

(2) Two single persons and their Families (as defined above) functioning as a single housekeeping unit;

(3) A group of not more than four persons not necessarily related by blood or marriage functioning as a single housekeeping unit;

7

(4) One person or two persons, one of whom shall be elderly and/or disabled, and one or both of whom own the dwelling unit, plus one Family; or

(5) Family (as defined above) or two single persons and their Families (as defined above) functioning as a single housekeeping unit, plus a caretaker and/or an exchange student.

(6) For the purpose of this section, "disabled" includes any person or person with a handicap or disability as those terms are defined in the Delaware Fair Housing Act, Title 6, Chapter 46, of the Delaware Code, as may be amended.

Residential Guests of an Owner (or of a tenant if a rental property) shall not be considered in determining compliance with the occupancy limitations set forth in this section. A Residential Guest is hereby defined as a temporary visitor occupying a Residence, or portion thereof, for no consideration. In the event a Residential Guest remains on the property for a period in excess of two (2) weeks, then the Owner shall register the Residential Guest with the Association. No Residence may be used as a rooming house, motel, hotel or otherwise for transient tenants who temporarily reside in or lease the Residence (or portion thereof, which in and of itself is prohibited).

Compl., Ex. 4 at Section 12.2.1(a), Dkt. No. 1 [hereinafter, "Amend."].

The Amendment also includes rules and regulations governing leases. *See, e.g.*, Amend. at Section 12.2.1(b)(2) ("A Residence may be leased no more than once in any twelve (12) month period and the minimum initial term shall not be less than three (3) months."). Additionally, Section 12.2.1(b)(6) of the Amendment includes an enforcement mechanism "[i]f any Owner or any tenant(s) is in violation of any of the provisions of the governing documents." That provision permits the Board to levy fines and, in certain circumstances, authorizes the Board to "bring an action in

8

its own name or in the name of the Owner, or both, to terminate the lease and have the tenant evicted and/or to recover damages (including but not limited to the full amount of rent paid and/or due to the Owner from the tenant(s)).” *Id*. at Section 12.2.1(b)(6).

### C. The Members Approve the Amendment By Ballot Without a Meeting.

At a September 21, 2018 meeting of the Association's board of directors (the “Board”), “[a] proposed Covenant change was presented that would limit the length of a lease of a property within the [Community] to one year.” Pl.'s Reply Br. in Supp. of Pl.'s Mot. for Summ. J. [hereinafter, “PRB”] Ex. 19, Dkt. No. 143. After discussion, the Board decided it would consult an attorney “for recommended wording” of a potential amendment. *Id*.

On March 1, 2019, the Board held a meeting at which SeaScape President Chris Nichols discussed “two methods to achieve approval of a Covenant change by the [Association] membership”—either by holding a Member vote at “a Community meeting,” or by disseminating “a mail request for a vote with a specific date for return of the vote which could be accompanied by informational meetings for the [Association] membership.” *Id*. at 2.[4] After discussion, “it was unanimous among

---

[4] Because the exhibits attached to Plaintiff's Reply Brief combine multiple documents with different pagination, the page numbers cited herein refer to the page numbers of the combined PDFs filed on the docket.

the Board members that the vote of the Covenant changes regarding rentals would be handled by mail." *Id.* The Board further determined that the Association would hold informational meetings on April 6, May 4 and June 1, 2019, to "acquaint the homeowners" with the Amendment, and would provide the Members with a "packet of information detailing the changes proposed for the Covenants as well as a voting ballot" with a deadline for returning the ballots to be set "no later than July 1, 2019." *Id.*[5]

On March 29, 2019, the Board held another meeting. PRB, Ex. 48. At that meeting, the Board again noted that informational sessions were scheduled for April 6, May 4 and June 1, 2019, to "share information about the proposed Covenant change, receive input from the property owners," and "generate participation in voting." PRB, Ex. 48.

In April 2019, the Board circulated fliers to the Members informing them of the upcoming informational meetings. PRB, Ex. 17. The Complaint alleges that at the April 6, 2019 meeting, former Association President James Wigand "misrepresented that owners' mortgage rates could be inflated unless owners voted to pass the Amendment," and further remarked that "[t]his is the reason our properties don't do as well as nearby communities" and "[w]e will continue to suffer

---

[5] The March 1, 2019 Board meeting minutes also note that "any change to the Covenants requires a positive vote of 66 2/3% of the membership." PRB, Ex. 17 at 2.

10

unless the Amendment is passed." Compl. ¶¶ 14-15. The Motions do not attach minutes of the April 6 meeting, but according to the Complaint, when Plaintiff "appropriately objected to the process, definitions, and terms of the Amendment," Wigand "sternly repeated her name," "slapped his leg as she began to speak," and "huffed and rolled his eyes before the Owners as she spoke." *Id*. ¶ 19.

On June 20, 2019, the Board distributed solicitation materials on the Amendment that included a cover letter, a copy of the proposed Amendment, "Q&A's," and a ballot. PRB, Ex. 18 at 1, 3.[6] The next day, on June 21, 2019, the Board held a meeting at which the Amendment was discussed. *Id*. at 1. The minutes of that meeting indicate ballots on the Amendment "went out yesterday[,] June 20, 2019," and that "[a]t the [June 22] Annual Meeting the homeowners w[ould] receive the agenda and the proposed Covenant change," but ballots would not be provided at that meeting. *Id*.

Throughout the month of July, Members received communications encouraging them to return their ballots on the proposed Amendment. A July 2019 Association newsletter stated: "The Board encourages you to return your ballot immediately, no matter which side of the issue you fall on. The Board would like to hear from every voice in the community. PLEASE RETURN YOUR BALLOT!"

_____

[6] Although documents in the record refer to the June 20, 2019 solicitation materials, the parties did not submit a copy of those materials with their Motions.

PRB, Ex. 20 at 3. On July 8, 2019, Nichols emailed the Members, reminding them to "VOTE NOW! MAKE YOUR VOICE BE HEARD!" PRB, Ex. 23 at 2. On July 15, 2019, Nichols emailed the Members again, encouraging them to return their ballots and stating, "We need to receive a signed ballot from each homeowner." *Id*. at 3. On July 17, 2019, Nichols circulated a mailer by email that stated: "WE WANT YOUR VOICE TO BE HEARD. EACH VOTE IS IMPORTANT!" *Id*. at 4. On July 24, 2019, another mailer was circulated, reporting that "As of this date, we have received ballots from over 55% of our homeowners. Our team of volunteers has been working diligently to get all of you to VOTE so that your voice will be heard. . . . Our goal? 100% return of ballots." *Id*. at 7. And on July 29, 2019, Nichols emailed the Members once more, informing them that they had "ONLY THREE DAYS LEFT TO VOTE!" *Id*. at 8. Nichols further noted that "[w]e need to receive your signed ballot by midnight JULY 31, 2019," identified a number of methods for returning the ballots, and echoed: "WE NEED TO HEAR YOUR VOICE! A signed ballot from each homeowner lets the POA Board know how you feel on this issue. Your voice, each homeowner's vote, is important." *Id*. at 8.[7]

---

[7] Plaintiff contends that SeaScape "reissued" ballots five times. Ballots were not "reissued," but a copy of the ballot was reattached to several electronic communications for ease of access.

On July 26, 2019, Plaintiff emailed Defendants "legal notice of [Plaintiff's] REFUSAL TO CONSENT to the current proposed [A]mendment . . . ." PRB, Ex. 21. Plaintiff did not return a ballot on the Amendment. PRB, Ex. 15.

On August 9, 2019, a public count of the ballots was performed by three Members, observed by the Board and several other Members. PRB, Ex. 21. Of 257 Members outstanding, 35 Members voted against the Amendment and 181 Members vote in favor, reflecting approval by 70% of the outstanding Members. PRB, Ex. 15; *see also* Amend. at 1. On August 11, 2019, Association President Eileen Terry sent a letter to the Members informing them of the results of the vote on the Amendment. PRB, Ex. 23.

On September 11, 2019, the Amendment was recorded with the Office of the Recorder of Deeds in and for Sussex County. Amend. at 1.

### D. Procedural History

Plaintiff filed the Complaint on September 25, 2020, approximately one year after the Amendment was recorded. The Complaint was filed in two parts, containing 150 paragraphs, three counts and 25 requests for relief. *See* Dkt. No. 1. Count I of the Complaint challenges the Amendment; Counts II and III raise unrelated grievances with the Association and SeaScape that will be addressed in a separate report.

13

Eleven months after the Complaint was filed, on August 18, 2021, Plaintiff filed motions to expedite and for a temporary restraining order, which the Chancellor denied on October 15, 2021. Dkt. Nos. 34-35. The parties then engaged in discovery. Over a period of approximately six months, Master Griffin, to whom the case was previously assigned, resolved three motions to compel, one motion for a protective order, one motion to supplement the Complaint and two motions to amend the scheduling order filed by Plaintiff, and one motion for a protective order, one motion to quash and one motion to compel filed by Defendants. *See, e.g.*, Dkt. Nos. 77, 87, 111, 115, 125. By letter dated June 29, 2022, Master Griffin directed the parties to combine any dispositive motions that they intended to pursue into one omnibus motion. Dkt. Nos. 127-28.

The present Motions were filed on August 1, 2022, and briefing was completed on September 14, 2022. This action was reassigned to me on January 10, 2023. On February 28, 2023, I held oral argument on the Motions.

## II. ANALYSIS

The parties have cross moved for summary judgment. Summary judgment will be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Ct. Ch. R. 56(c). "When the Court is faced with cross-motions for summary judgment the same standard must be applied to each of the parties' motions and the mere existence of cross-motions does

14

not necessarily indicate that summary judgment is appropriate for one of the parties." *Baring v. Condrell*, 2004 WL 2340047, at *3 (Del. Ch. Oct. 18, 2004). "Thus when presented with cross-motions for summary judgment a movant will be granted relief only if the Court determines that the record does not require a more thorough development to clarify the law or its application to the case." *Id.*

Under Court of Chancery Rule 56, "[t]he movants have the initial burden of demonstrating the absence of a material factual dispute. If the movants meet their burden, the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial." *Ogus v. SportTechie, Inc.*, 2023 WL 2746333, at *9 (Del. Ch. Apr. 3, 2023) (quotation marks omitted). At that point, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading . . . ." Ct. Ch. R. 56(e).

The summary judgment standard does not change simply because Plaintiff has appeared *pro se*. When reviewing submissions from a *pro se* litigant, like the Plaintiff here, this Court may "exhibit some degree of leniency . . . in order to see that [the litigant's] case is fully and fairly heard," but "self-representation is not a blank check for defect." *Durham v. Grapetree, LLC*, 2014 WL 1980335, at *5 (Del. Ch. May 16, 2014) (quotation marks omitted). To comprehend and assess Plaintiff's claims, I have attempted to consider all of the statements made in her Complaint,

15

motion, briefs, deposition, and at oral argument; yet I cannot accept as true "mere allegations or denials" where no material issue of fact otherwise exists.

The following analysis (1) rejects Defendants' argument that Plaintiff lacks derivative standing to challenge the Amendment, concluding that Plaintiff has standing under Section 225 of the DGCL to pursue her claim; (2) considers each of the purported procedural defects raised in Plaintiff's papers to challenge the Amendment; and (3) resolves Plaintiff's contentions that the Amendment is facially invalid. Because Plaintiff's procedural and substantive challenges to the Amendment are not supported by the law or the factual record, I conclude that Plaintiff's motion for summary judgment on Count I should be denied, and Defendants' motion for summary judgment on Count I should be granted.

**A. Does Plaintiff Have Standing To Challenge The Amendment?**

As a threshold matter, Defendants argue that Plaintiff lacks standing to challenge the Amendment because "[s]he has not brought a derivative action against The Glade." Opening Br. in Support of Def. Mot. for Summ. J. on Behalf of Def. at 21, Dkt. No. 135 [hereinafter, "DOB"]. According to Defendants, Plaintiff's claim is derivative because the Amendment "concerns all of The Glade's members, and if the relief sought by [Plaintiff] is granted the effect on all of the members would be equal." *Id.* Plaintiff cannot pursue a derivative claim because she has neither

16

engaged an attorney[8] nor made any attempt to satisfy the demand futility requirements of Court of Chancery Rule 23.1. *Id*. at 22.

Defendants' standing argument misses the mark. The Association is a Delaware nonstock corporation governed, in part, by the DGCL. *See* 25 *Del. C.* § 81-108 ("[T]he laws of this State that apply to the association's form of entity apply to the association except to the extent that law is inconsistent with this chapter, in which case this chapter governs."); 25 *Del. C.* § 81-326 ("Any association that is a Delaware corporation shall also be subject to the Title 8, which shall govern and control to the extent not inconsistent with this chapter."). The DGCL provides a mechanism through which a stockholder—or in the case of a nonstock corporation, a member—may challenge voting results. Specifically, as applied to nonstock corporations,[9] Section 225(b) provides that "[u]pon application of any [member] or upon application of the corporation itself, the Court of Chancery may hear and determine the result of any vote of [members] upon matters other than the election

---

[8] *See Kelly v. Fuqi Intern, Inc.*, 2013 WL 135666, at *7 (Del. Ch. Jan. 2, 2013) ("A derivative action may not be brought *pro se*.").

[9] *See* 8 *Del. C.* §114(a) ("Except as otherwise provided in subsections (b) and (c) of this section, the provisions of this chapter and of chapter 5 of this title shall apply to nonstock corporations in the manner specified in the following paragraphs (a)(1)-(4) of this section: (1) All references to stockholders of the corporation shall be deemed to refer to members of the corporation").

of directors or officers." 8 *Del. C.* §225(b).[10] Defendants do not contest Plaintiff's status as a Member of the Association, or that the vote on the Amendment is a "matter[] other than the election of directors or officers." Accordingly, Plaintiff has statutory standing to challenge the Amendment.

### B. When does the DUCIOA apply?

Many of Plaintiff's procedural and substantive attacks on the Amendment are premised on purported noncompliance with the DUCIOA. Resolving those arguments requires identifying which statutory provisions do, and do not, apply to the Community as a pre-existing community under the DUCIOA.

"The DUCIOA states that '[e]xcept as provided in this subchapter,' its provisions apply 'to all common interest communities created within this State' after its effective date of September 30, 2009." *Bragdon v. Bayshore Prop. Owners Ass'n, Inc.*, 251 A.3d 661, 674 (Del. Ch. 2021) (citing 25 *Del. C.* § 81-116). Pre-existing communities created *prior* to the September 30, 2009 effective date, on the other hand, are subject only "to certain specified sections of the statute," referred to herein as "Enumerated Provisions." *Id.*; *see also Beck*, 2020 WL 6742708, at *2 (citing 25 *Del. C.* § 81-119). The Enumerated Provisions applicable to pre-existing communities include:

---

[10] *Cf. Beck v. Greim*, 2016 WL 3962053, at *3 (Del. Ch. July 22, 2016) (holding *pro se* plaintiff had standing to challenge director removal under Section 225).

18

§ **81-120** (Exception for small preexisting cooperatives and planned communities), and § **81-124** and except as limited by § **81-122** of this title hereof, §§ **81-105**, **81-106**, **81-107**, **81-127**, **81-203**, **81-204**, **81-217(i)**, **81-221**, **81-301**, **81-302(a)(1)** through (**6**) and (**11**) through (**17**), **81-302(f)**, **81-302(g)**, **81-303**, **81-306**, **81-307(a)**, **81-308A**, **81-309(a)**, **81-310**, **81-311**, **81-314**, **81-315**, **81-316**, **81-318**, **81-321**, **81-322** [repealed], **81-323**, **81-324**, **81-409**, and **81-417** of this title, and § **81-103** of this title to the extent any definitions are necessary in construing any of the foregoing sections to the extent the definitions do not conflict with the declaration . . . .

25 *Del. C.* § 81-119 (emphasis added).

"Other than the Enumerated Provisions, the DUCIOA does not apply to Pre-Existing Communities at all, unless the community has opted in." *Bragdon*, 251 A.3d at 674. While "the Enumerated Provisions apply to the exclusion of any *conflicting* provisions in the governing documents of a Pre-Existing Community," the Enumerated Provisions also "do not invalidate existing provisions of the [governing documents] that do not conflict with" the DUCIOA. *Id.* at 674-75 (emphasis added).

The Community here is a pre-existing community under the DUCIOA. Therefore, challenges premised on non-compliance with provisions of the DUCIOA other than the Enumerated Provisions cannot succeed.

### C. Did the Amendment Comply with the DUCIOA's Procedures for Actions by Ballot Without a Meeting?

Plaintiff argues that the Amendment violates Section 81-310(f) of the DUCIOA, which addresses actions taken by ballot without a meeting.

19

Plaintiff alleges that "[t]he Amendment was taken off the agenda promised for the June 22, 2019 Annual Meeting (which issued one day before the meeting) and the deadline to return the ballots was extended past midnight on July 31, 2019." Compl. ¶ 23. Although her argument is not clear, Plaintiff appears to contend that the Amendment was initially scheduled for a vote at the June 22, 2019 annual meeting, but the Board then changed course and decided instead to put the Amendment to a vote by ballot without a meeting, extending "the deadline to return the ballots . . . because not enough positive votes had been received by the deadline." *Id.* ¶ 23.

Plaintiff does not explain how this course of events violated Section 81-310(f). Section 81-310(f), which is an Enumerated Provision, states that "[a]ction may be taken by ballot without a meeting as follows:"

> (1) Unless prohibited or limited by the declaration or bylaws, any action that the association may take at any meeting of members may be taken without a meeting if the association delivers a written or electronic ballot to every member entitled to vote on the matter. A ballot shall set forth each proposed action and provide an opportunity to vote for or against each proposed action.

> (2) All solicitations for votes by ballot must: (A) indicate the number of responses needed to meet the quorum requirements; (B) state the percentage of approvals necessary to approve each matter other than election of directors; (C) **specify the time by which a ballot must be delivered to the association in order to be counted, which time shall not be less than 3 days after the date that the association delivers the ballot**; and (D) describe procedures (including time and size and manner) by

20

> when unit owners wishing to deliver information to all unit owners regarding the subject of the vote may do so.

25 *Del. C.* § 81-310(f)(1)-(2) (emphasis added).

If Plaintiff means to argue that action by ballot without a meeting was not permitted, that argument fails. Section 81-310 expressly permits action to be taken by ballot without a meeting. Similarly, Section 14.2.1 of the Declaration permits votes on amendments by "mail canvassing." Declaration at Section 14.2.1.

If Plaintiff's argument is that the Board improperly changed course by taking the vote by mail ballot instead of at the annual meeting, that is contradicted by the record evidence, which shows that the Board decided in March 2019 to take action on the Amendment by mail ballot and included the Amendment on the annual meeting agenda only as a discussion topic. PRB, Ex. 17. In any event, Plaintiff has not explained how any supposed change in plans to conduct the vote by mail might provide a basis to invalidate the Amendment.

Finally, to the extent Plaintiff believes the voting deadline was improperly "extended" to July 31, 2019, this theory likewise is untenable. Section 81-310(f)(2)(C) requires solicitation materials to "specify the time by which a ballot must be delivered to the association in order to be counted, which time shall not be less than 3 days after the date that the association delivers the ballot." 25 *Del. C.* § 81-310(f)(2)(C). Section 14.2.1 of the Declaration requires that proposed amendments be provided, "in the case of a mail canvassing, at least *two weeks* prior

21

to the required return date of the mailed ballots." Declaration at Section 14.2.1 (emphasis added). While the DUCIOA and the Declaration provide a *minimum* time period for receiving ballots—which was satisfied here—neither prohibits the Board from reasonably *extending* the deadline to accept additional ballots.[11]

## D. Did Improper Conduct at Board Meetings Prior to the Member Vote Render the Amendment Invalid?

Although the vote on the Amendment occurred by ballot without a meeting, Plaintiff also argues that the Amendment should be invalidated because at Board meetings preceding the vote, (1) Plaintiff was prevented from voicing her objections on the Amendment, and (2) the Association President made inaccurate statements about the Amendment.

First, Plaintiff argues that the Amendment is invalid because she was prevented from fully voicing her objections at meetings prior to its adoption. Compl. ¶ 19. Section 81-308A of the DUCIOA, which is an Enumerated Provision, requires that meetings of the executive board "be open to the unit owners except for executive sessions." That section also requires board meetings to be noticed "not fewer than 10 nor more than 60 days in advance of the meeting" with an agenda that

---

[11] Because the parties have not submitted the June 19, 2019 solicitation materials in support of their Motions, I do not consider whether those materials otherwise comply with Section 81-310(f)(2). In any event, except as described above, Plaintiff has not argued that the solicitation materials violated the DUCIOA or the Declaration in any other respect. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

"include[es] an opportunity for unit owners to offer comments to the executive board regarding any matter affecting the common interest community." 25 *Del. C.* § 81-308A(b)-(c).

Plaintiff contends that when she "appropriately objected to the process, definitions, and terms of the Amendment" at an informational meeting held on April 6, 2019, the former Association President, James Wigand, "sternly repeated her name," "slapped his leg as she began to speak," and "huffed and rolled his eyes before the Owners as she spoke." Compl. ¶ 19. However, in making this allegation, Plaintiff effectively concedes that she was, in fact, given an opportunity to offer comments on the Amendment, even if her objections were ill received by the Association President.[12] This does not support a violation of the DUCIOA.

Second, Plaintiff disagrees with statements made by Wigand during the April 6, 2019 informational meeting, including that "owners' mortgage rates could be inflated unless owners voted to pass the Amendment," "[t]his is the reason our properties don't do as well as nearby communities," and "[w]e will continue to suffer unless the Amendment is passed." Compl. ¶¶ 14-15. If Plaintiff means to suggest that Wigand's comments misinformed the Members who voted on the Amendment, this argument fails because a reasonable person would have recognized that

---

[12] It also is not clear from the record that the April 6, 2019 "informational meeting" was a "meeting of the executive board" governed by Section 81-308A.

Wigand's statements simply reflected his own opinions. *See Smart Loc. Unions & Councils Pension Fund v. BridgeBio Pharma, Inc.*, 2022 WL 17986515, at \*18 (Del. Ch. Dec. 29, 2022); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at \*3 (Del. Ch. Aug. 26, 2005). Plaintiff's disagreement with those opinions does not cast doubt on the validity of the vote on the Amendment.

### E. Does SeaScape's Participation in the Process Provide a Basis to Invalidate the Amendment?

Plaintiff also questions the validity of the Amendment based on SeaScape's solicitation of ballots from Members. According to Plaintiff, the DUCIOA and the Governing Documents require the Association's Secretary to "issue, collect, [and] control the ballots," but instead, the Board improperly delegated that responsibility to Chris Nichols at SeaScape, who "handled the voting procedures for the Amendment voting" by "issu[ing] and re-issu[ing] ballots and solicit[ing] votes on behalf of 'The Board.'" Pl.'s Omnibus Mot. For Declaratory J. and Summ. J. on Counts I, II and III Under Chancery Ct. R. 56(a), 56(c) and 57 ¶ 25, Dkt. No. 137 [hereinafter, "Pl.'s Mot."]; *see also* Compl. ¶¶ 62, 64, 76.

Plaintiff's argument fails on the law and the undisputed facts. As an initial matter, nothing in the DUCIOA or the Governing Documents requires the corporate secretary—as opposed to any other director, officer, or agent—to personally collect ballots when a Member vote is taken without a meeting. Plaintiff bases her argument on Section 81-309(a)(2), but that provision states quorum requirements; it does not

24

impose any specific obligations on the Secretary. And although the Bylaws do impose certain duties on the Secretary—for instance, to act as clerk for, and to give proper notice of, meetings[13]—the Bylaws do not address the Secretary's role in actions by ballot without a meeting.

In any event, the undisputed record evidence shows that in connection with the Amendment, the Board (including the Secretary) oversaw SeaScape's involvement. Solicitation materials were disseminated to Members at the direction of the Board and "[u]nder the guidance of Jennine Anderson, Secretary." PRB, Ex. 23. The full Board, including the Secretary, observed the public ballot count. Amend. at 1. And while SeaScape undisputedly played a role in the process, nothing in the DUCIOA or the Governing Documents prohibits directors and officers, including the Secretary, from seeking assistance from agents and employees in fulfilling their corporate duties. In fact, both the DUCIOA and the Bylaws expressly contemplate that they may do so. *See* 25 *Del. C.* § 81-302(a)(3) (authorizing the Association to "hire . . . managing agents and other employees, agents, and independent contractors"); Bylaws at Section 6 (empowering the Board "[t]o appoint agents, clerks, assistants, factors, employees and trustees").[14]

---

[13] Bylaws at Sections 3, 13.

[14] Plaintiff also alleges in her Complaint that Nichols' involvement "jeopardized the fairness of The Glade elections" because in prior elections, ballots "went missing and were not available to be counted." Compl. ¶¶ 87-88; *see also id.* ¶ 127 ("The voting procedure on the Amendment cannot be trusted because prior elections ignored voting standards

In short, Plaintiff has not identified any persuasive reason to invalidate the Amendment based on SeaScape's involvement with the vote.

## F. Was The Amendment Approved by the Requisite Vote of the Members?

Plaintiff also contends that the Amendment was not validly approved by the Members because (1) the vote did not satisfy the quorum requirements in Section 81-309 of the DUCIOA; (2) the Amendment did not receive sufficient votes for approval under Section 81-217(f) of the DUCIOA; (3) ballots not signed by all co-owners were improperly counted in the vote; (4) a ballot signed by one non-Member was improperly counted in the vote; and (5) ballots submitted on behalf of the Community's common lots were improperly counted in the vote. I address each of those arguments below.

---

contained in the Declaration and the Bylaws and paved the way for more non-compliant voting procedures."). However, since reviewing the ballots in discovery, Plaintiff has not submitted evidence—or even argued—that any ballots on the Amendment went missing, or that SeaScape's involvement changed the results of the vote in any way.

Plaintiff also alleges that in a July 17, 2019 email, Nichols stated that "only positive votes count." Compl. ¶ 79. While the meaning of this supposed statement is debatable, contrary to Plaintiff's allegation, the document attached to her motion does not include that statement. PRB, Ex. 23. The record evidence on which Plaintiff relies contains several communications from Nichols encouraging Member participation in the vote without expressing a view on the outcome.

## 1. Quorum Requirements

Plaintiff argues that under Section 81-309 of the DUCIOA, the Member vote on the Amendment did not satisfy quorum requirements. *See* Compl. ¶ 62; DOB, Ex. C at 35:2-3 [hereinafter, "August Dep. Tr."].

Section 81-309(a), which is an Enumerated Provision, states that:

> *Unless the bylaws provide otherwise*, a quorum is present throughout any meeting of the association if:
>
> > (1) Persons entitled to cast at least 20 percent of the votes in the association are present in person, by proxy or by ballot at the beginning of the meeting, provided that at least 25 percent of the unit owners not related to the declarant are present; or
> >
> > (2) Ballots solicited in accordance with § 81-310(f) of this title [governing action taken by ballot without a meeting] are delivered to the secretary in a timely manner by persons who, together with those persons present in person or by proxy or ballot at the beginning of the meeting, would comprise a quorum for that meeting.

25 *Del. C.* § 81-309(a) (emphasis added). The Bylaws increase the default quorum requirement in the DUCIOA from 20% to 25%. *See* Bylaws at Section 3 ("For the purpose of voting on any matter, the 25% quorum requirement shall consist of the total of the number of members entitled to vote who are present in person or represented by proxy, plus the number of absentee ballots cast on said matter.").

Of 257 Members outstanding, 216 ballots were delivered (181 voting for, and 35 voting against, the Amendment). This represented 84% of the Members outstanding, satisfying the 25% quorum requirement.

27

## 2. Vote Required for Approval

Plaintiff next argues that the Amendment failed to receive sufficient Member votes to be approved.[15]

The Amendment was approved by approximately 70% of the Members outstanding. *See* Amend. at 1; PRB, Ex. 15. Measured against Section 14.2.1 of the Declaration, which requires "the affirmative vote of at least sixty six percent (66%) of the Members of record entitled to vote," the Amendment was approved. Declaration at Section 14.2.1; Amend. at 1; PRB, Ex. 15. Plaintiff argues, however, that to amend a declaration to "prohibit or materially restrict the permitted uses of or behavior in a unit or the number or other qualifications of persons who may occupy units," Section 81-217(f) of the DUCIOA requires the affirmative "vote or agreement of unit owners of units to which at least *80 percent* of the votes in the association are allocated . . . ." 25 *Del. C.* § 81-217(f) (emphasis added); Compl. ¶ 126.

This challenge cannot succeed because Section 81-217(f) is not an Enumerated Provision applicable to pre-existing communities. The 80% voting threshold in Section 81-217(f) does not apply. Section 14.2.1 of the Declaration

---

[15] *See* Compl. ¶ 13 ("the DUCIOA § 217(f) requires an 80% affirmative vote 'to materially restrict the uses or behavior in or other qualifications of persons who may occupy units' and 100% affirmative consent 'to change the allocated interests of a unit'").

controls, and the Amendment was approved by more than 66% of the Members entitled to vote.

### 3. Signature of Co-Owners

Plaintiff also challenges the Amendment on the basis that 28 or 35 ballots submitted by Members who jointly own property in the Community were not signed by all owners of the property. Pl.'s Mot. ¶ 17 ("thirty-five of the 'Yes' votes on the Amendment were signed by only 1 record owner for two-owner properties"); Pl. Jennifer August's Omnibus Op. Br. in Supp. of her Mot. for Declaratory J. and Summ. J. Directed to Defs. at 33, Dkt. No. 136 ("'There are 28 invalid affirmative votes of two-owner properties'"); PRB at 10-11; August Dep. Tr. 33:7-22.

Plaintiff's contention appears to be that all owners of a unit are required to vote in order for that unit's vote to be valid. However, Section 81-310 of the DUCIOA, which is an Enumerated Provision, provides that "[i]f only 1 of several owners of a unit is present at a meeting of the association, that owner is entitled to cast all the votes allocated to that unit." 25 *Del. C.* § 81-310(a). Plaintiff's argument is also contradicted by the Bylaws, which provide that "[t]here shall be only one (1) vote cast for each Unit," and require that "[t]he *person* casting a vote with respect to a Unit must be identified on a deed . . . as *an owner*." Bylaws at Section 3 (emphasis added). In other words, the Bylaws contemplate that one "person" identified on the

29

deed as "an owner" may cast the vote, and signatures of all other joint owners are not required.

### 4. Vote of One Non-Member

Plaintiff also challenges the validity of one ballot submitted by the Association President, Eileen Terry, whom she claims does not own property in the Community. *See* Compl. ¶ 12 ("the Amendment . . . was voted upon and executed by . . . a non-owner"); Pl.'s Mot. ¶ 12 ("Eileen Terry, Glade non-owner . . . cast a vote 'for' the Amendment"); August Dep. Tr. 33:1-2 ("[O]ne non-owner was allowed to vote on the covenant amendment."). Plaintiff is correct that only Members could validly vote on the Amendment. Declaration at Sections 3.2.1, 3.3. Even so, because excluding one ballot would not change the results of the vote, this challenge cannot succeed.

### 5. Votes of Common Lots

In her Complaint, Plaintiff alleges that "the Board self-dealt ballots for the seven common lots in The Glade and cast affirmative votes through these instruments . . . ." Compl. ¶ 65. Defendants explained in their verified interrogatory responses that only two lots are owned by the Association,[16] and Plaintiff did not

---

[16] Dkt. No. 136, Ex. A (Def.'s Resp. to Pl.'s Second Set of Interrog. Directed to Def. No. 151).

30

press this argument in briefing or at argument, nor has she submitted any evidence to support it.[17]

### 6. Verification of Signatures

Plaintiff also contends that the vote on the Amendment is invalid because signatures on the ballots were not "verified." PRB at 11; August Dep. Tr. 36:14. Plaintiff has not identified any statute or provision in the Governing Documents requiring that signatures on ballots be verified, and I am aware of none. Accordingly, this challenge also fails.

## G. Is the Amendment Facially Invalid?

In addition to her procedural challenges, Plaintiff also argues that the Amendment is facially invalid.

"In asserting [her] facial challenge, the plaintiff must show that the [governing documents'] provisions 'cannot operate lawfully or equitably under any circumstances.' Plaintiff[] must demonstrate that the [governing documents'] provisions 'do not address proper subject matters' as defined by statute, 'and can never operate consistently with law.'" *Salzberg v. Sciabacucchi*, 227 A.3d 102, 113 (Del. 2020).

---

[17] The Complaint also suggests proxies issued more than three years before the vote might have been cast, Compl. ¶ 16, but Plaintiff has not pursued this argument or identified any evidence supporting it. *See Emerald Partners*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

31

The Amendment here addresses a proper subject matter under the broad, enabling provisions of the DUCIOA and the Unit Property Act ("UPA"). Notably, Section 81-205(b) of the DUCIOA provides that "[t]he declaration may contain any other matters the declarant considers appropriate, including any restrictions on the uses of a unit or the number of other qualifications of persons who may occupy units." 25 *Del. C.* § 81-205(b).[18] While Section 81-205 is not an Enumerated Provision, the UPA states, in similarly broad fashion, that "[t]he code of regulations . . . may include other lawful provisions." 25 *Del. C.* § 2208.

Accordingly, to support her claim of facial invalidity, Plaintiff must establish that the Amendment violates the law. In an attempt to do so, Plaintiff raises two arguments: (1) that the definition of "family" in the Amendment is discriminatory under state and federal law; and (2) that the enforcement procedure in the Amendment, authorizing the Association in certain circumstances to bring an action against a tenant in the name of the property owner, violates the law.

### 1. Is the Amendment Discriminatory?

Plaintiff argues that the Amendment violates state and federal fair housing laws. Citing the federal and state Fair Housing Acts, Plaintiff contends that the

---

[18] Section 81-217(f), also not an Enumerated Provision, specifically provides that "an amendment to the declaration may prohibit or materially restrict the permitted uses of or behavior in a unit or the number or other qualifications of persons who may occupy units. The amendment must provide reasonable protection for a use or occupancy permitted at the time the amendment was adopted." 25 *Del. C.* § 81-217(f).

Amendment "targets disabled and elderly owners and, through the definition, strips them of their 'Family' status." Pl.'s Mot. ¶ 52; *see also* Compl. ¶¶ 8-9.

In support of her argument, Plaintiff cites 42 U.S.C. § 3603 [Effective dates of certain prohibitions] and 42 U.S.C. § 3607 [Religious organization or private club exemption], but seemingly intends to allege violations of 42 U.S.C. § 3604 [Discrimination in the sale or rental of housing and other prohibited practices]. Section 3604 prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b); *see also* 24 C.F.R. § 100.60; 24 C.F.R. § 100.70. Similarly, 6 *Del. C.* § 4603(b)(1) prohibits discrimination in the sale or rental of a dwelling "because of race, color, national origin, religion, creed, sex, marital status, familial status, source of income, age, sexual orientation, gender identity or disability." 6 *Del. C.* § 4603(b)(1). "Familial status," under both the federal and state Fair Housing Acts, refers to the presence of children under the age of 18 in a household. 42 U.S.C. § 3602(k); 24 C.F.R. § 100.20; *see also* 6 *Del. C.* § 4602(14).[19]

---

[19] Plaintiff also cites to 10 *Del. C.* § 901(12), which defines "Family" for purposes of the Family Court's jurisdiction. That statute is not relevant here.

33

On its face, the Amendment does not discriminate on the basis of any of the protected classes identified in the federal or state Fair Housing Acts. Plaintiff contends that the Amendment "targets disabled and elderly owners" by "prevent[ing] elderly and disabled persons from moving into a 'family's' home in the The Glade without a lease," and by prohibiting individuals with disabilities "from continuing to own property without leasing it to themselves." Compl. ¶ 8.[20] It does not. The Amendment provides that "[a]ll Residences shall be used only as single family, private, residential dwellings and for no other purpose," defining a "Residence" as "a residential dwelling designed or occupied by not more than one of the following as a single housekeeping unit with single culinary facilities." Amend. at Section 12.2.1(a). The list of permitted occupants includes "[a] Family, defined as a group consisting of one person or a married couple with any number of natural children, foster children, stepchildren, adopted children, parents, grandparents and/or grandchildren." Amend. at Section 12.2.1(a)(1). That definition does *not* exclude members of a Family who may be disabled or elderly. Permitted occupants *also* include "[o]ne person or two persons, one of whom shall be elderly and/or disabled, and one or both of whom own the dwelling unit, *plus one Family*." Amend. at Section 12.2.1(a)(4) (emphasis added). That class of occupants

---

[20] *See also* Compl. ¶ 8 ("The Amendment does not allow elderlies or disabled persons to simply move in with their family, illegally restricting use and dismantling prosocial notions of a common interest community.").

is more—not less—inclusive than the definition of "Family," which itself does not exclude individuals with disabilities or who are elderly.

Accordingly, Plaintiff's contention that the Amendment is invalid as discriminatory fails.

## 2. Is the Enforcement Provision Invalid?

Plaintiff also challenges as facially invalid Section 12.2.1(b)(6) (the "Enforcement Provision"), which provides an enforcement mechanism "[i]f any Owner or any tenant(s) is in violation of the provisions of the governing documents . . . ." Amend. at Section 12.2.1(b)(6). Under the Amendment, after levying a first and second fine, "the Board may . . . bring an action in its own name or in the name of the Owner, or both, to terminate the lease and have the tenant evicted and/or to recover damages . . . ." *Id*. at Section 12.2.1(b)(6).

First, Plaintiff argues that the Enforcement Provision is "contrary to DUCIOA §81-303(b)." Compl. ¶ 11. But Section 81-303(b) prohibits the Board from acting on behalf of the Association "to amend the declaration or the bylaws, to terminate the common interest community, or to elect members of the executive board or determine the qualifications, power and duties, or terms of office of executive board members"—it does *not* prohibit the Board from enforcing provisions of the Association's Governing Documents.

Plaintiff also argues that the Enforcement Provision violates Section 5703 of the Residential Landlord-Tenant Code, which states that an eviction proceeding before the Justice of the Peace Court "may be initiated by: (1) The landlord; (2) The owner; (3) The tenant who has been wrongfully put out or kept out; (4) The next tenant of the premises, whose term has begun; or (5) The tenant." 25 *Del. C.* § 5703. As Plaintiff correctly identifies, Section 5703 does not expressly permit a homeowner's association to initiate an eviction proceeding. On the other hand, Section 81-302(c) of the DUCIOA authorizes an association to enforce any rights against a tenant that the landlord could lawfully have exercised under a lease:

> If a tenant of a unit owner violates the declaration, bylaws or rules of the association, in addition to exercising any of its power against the unit owner, the association may . . .

> (4) Enforce any other rights against the tenant for the violation which the unit owner as landlord could lawfully have exercised under the lease or which the association could lawfully have exercised directly against the unit owner, or both.

25 *Del. C.* § 81-302(c).

Although characterized as a challenge to the facial validity of the Amendment, what Plaintiff seeks in actuality is an advisory ruling on the enforceability of an Amendment that purports to give the Association standing to pursue certain remedies in the Justice of the Peace Court, when no such remedies have actually been sought. "[O]ur courts do not render advisory opinions about hypothetical situations that may not occur." *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*,

36

73 A.3d 934, 959 (Del. Ch.), *judgment entered sub nom. Boilermakers Loc. 154 Ret. Fund & Key W. Police & Fire Pension Fund v. Chevron Corp.* (Del. Ch. 2013). That question is better put to the Justice of the Peace Court in a ripe controversy before it, and does not support Plaintiff's facial challenge here.[21]

Accordingly, Plaintiff's challenge to the facial validity of the Amendment fails.[22]

## III. CONCLUSION

For the reasons explained above, Plaintiff has failed to present any valid procedural or substantive bases for challenging the Amendment, nor has she overcome Defendants' showing, based on the undisputed record, that they are

---

[21] I note that, under Section 203 of the DUCIOA—an Enumerated Provision—"[a]ll provisions of the declaration and bylaws are severable," so even if the Enforcement Provision were unenforceable, that would not support a wholesale invalidation of the Amendment as Plaintiff seeks here. 25 *Del. C.* § 81-203(a).

[22] Plaintiff also argues that the Enforcement Provision converts "lease monies to the Association . . . violating the 'private' and 'independent use' of units described in the U.P.A. §2202(19)." Compl. ¶ 10. That statute defines "Unit" under the UPA; it does not support Plaintiff's challenge here. *See* 25 *Del. C.* § 2202(19) ("'Unit' means a part of the property designed or intended for any type of independent use which has a direct exit to a public street or way . . . .").

Plaintiff further contends that the Amendment changes "the allocated interests of a unit" without "unanimous consent of the unit owners." 25 *Del. C.* § 81-217(d). Setting aside that Section 81-217(d) is not an Enumerated Provision, Plaintiff has not explained, and it is not apparent to me, how the Amendment has changed the allocated interests of any units.

Finally, Plaintiff also argues that the Amendment creates a "nuisance," citing 10 *Del. C.* § 1827, which is not a statute in our Code. Compl. ¶ 136. Plaintiff has not explained this argument, which does not create a triable issue of fact that could preclude summary judgment.

entitled to summary judgment on these issues. Accordingly, I recommend that Plaintiff's motion for summary judgment be denied, and Defendants' motion for summary judgment be granted, on Count I of the Complaint.[23]

This is a final report pursuant to Court of Chancery Rule 144. In the interests of efficiency and judicial economy, exceptions to this report are stayed pending my forthcoming ruling on the parties' motions for summary judgment on Counts II and III of the Complaint.

---

[23] Plaintiff has also moved for a declaratory judgment pursuant to Court of Chancery Rule 57. I recommend denial of that motion for all the reasons discussed herein.